IN THE MATTER OF VINCENT JAMES MILITA, II, AN ATTORNEY AT LAW.

Argued March 5, 1985—Decided May 22, 1985.

*William R. Wood,* Deputy Ethics Counsel, argued on behalf of the Office of Attorney Ethics.

*Matthew R. McCrink* argued the cause for respondent (*McCrink, Nelson & Kehler,* attorneys).

PER CURIAM.

This matter arises from a report of the Disciplinary Review Board (DRB) recommending a two-year suspension of respondent. The recommendation is based on its finding of an attempted offer to bribe an assistant prosecutor and of the creation of a false impression that he was the attorney for a State's witness when, in fact, he represented another party and wanted to elicit evidence favorable to that client. Based upon our independent review of the record, we are not clearly convinced that the respondent intended to offer a bribe to the prosecutor involved. We are, however, clearly convinced that the conduct was highly unprofessional and was unethical and prejudicial to the administration of justice, reflecting adversely on respondent's fitness to practice law. In addition, we agree that the respondent's conduct in speaking to a hostile witness involved an unethical concealment of his true purpose in interviewing the witness. We modify the discipline recommended to a six-month suspension.

Respondent was admitted to the bar on June 12, 1980 but did not commence private practice until 1981. He was a single practitioner. A good deal of his work was criminal defense. He had both private clients and public defender assignments as a pool attorney.

He was retained privately, in 1982, to represent an accused on several counts of burglary and possession of stolen property. On September 15, 1982, respondent telephoned an assistant county prosecutor to discuss this particular criminal case as well as others that were scheduled for pretrial conference on the following day, the 16th of September. Respondent had had many similar plea conferences with the same assistant prosecutor.

When the discussion turned to the particular defendant, the prosecutor said that there was no change in the State's earlier position: any plea bargain would have to contemplate a prison sentence with a period of parole ineligibility. It is at this point that the conversation becomes critical. The prosecutor stated that Mr. Milita responded by asking whether the prosecutor would consider an "indeterminate" sentence for "a thousand dollars," to be given to the prosecutor's favorite charity.

The assistant prosecutor concluded that the respondent was suggesting that money would be paid for a more lenient recommendation by the State. His immediate response to respondent's statement was that his favorite charity was the State of New Jersey and that, in any event, this criminal defendant was beyond the statutory age limitation to receive an indeterminate term. The discussion turned to other matters.

Near the end of the conversation, the prosecutor raised the topic again and asked respondent just what he had in mind when he mentioned the $1,000 figure. The prosecutor stated that he went on at some length about his hopes that Mr. Milita was not suggesting what appeared to him to be a major impropriety, informing Mr. Milita that such suggestions could not be entertained for as much as a fraction of a second by the prosecutor.

The prosecutor states that at this point respondent explained that in his discussions with his client the client would frequently tell him there would be an extra $1,000 in his fee if he could do better than the offer he already had and that respondent was just passing on the suggestion to him, realizing that his favorite charity was the State of New Jersey.

Respondent, on the other hand, maintained that he told the assistant prosecutor that his client was extremely upset because the State would not change the plea offer. When the client offered him the $1,000 bonus, the respondent said that he told his client that he did not appreciate the offer and that as

far as he was concerned, the client could give the money to charity.

The assistant prosecutor immediately conferred with the county prosecutor and chief of county detectives. The county prosecutor authorized that a listening device be employed in order to record the next conversation. The assistant prosecutor was accordingly outfitted with a tape recorder for the scheduled September 16, 1982 conference with respondent. At this conference, the assistant prosecutor took the respondent aside into a private room. After discussing several other pending cases, the assistant prosecutor renewed the discussion of the burglary case. Portions of the transcript of that conversation follow.[1]

> KC: Well, what about this other situation here. Now that we're off the telephone. It's rather difficult to have discussions like you were beginning to have on the phone.
>
> JM: You know I was kidding.[2]
>
> KC: Well, what did you have in mind?
>
> JM: You can't give him indeterminate time obviously (inaudible) I told him that I felt that the bottom line, the lowest I could see you going would be either four, eight with a 4 stip, seven minimum or twelve three, whatever we had discussed before, but he's probably figuring it's a five years straight.
>
> KC: With no minimum.
>
> JM: No minimum.
>
> KC: He's pushing you pretty hard on it?
>
> JM: Huh?
>
> KC: Is he pushing you pretty hard on it?
>
> JM: He's not pushing me I mean like you he's pushing his parents.    *  *  *
>
>        *       *       *       *       *       *       *       *
>
> KC: * * * Well, seriously if this, what we were saying on the phone I mean you catch me with a couple of people in the office on the telephone and if you want to discuss something like that the telephone's not the place to do it.
>
> JM: What's that.

---

[1]Apparently the transcript of this conversation was not introduced in evidence before either the District Ethics Committee or the Disciplinary Review Board, although both the assistant prosecutor and respondent testified concerning the conversation. By consent it was made part of the record before us.

[2]KC is the assistant prosecutor. JM is the respondent.

KC: What you mentioned on the phone yesterday?

JM: What the $1,000.00?

KC: Yeh.

JM: What do you mean?

KC: Well, what did you mean by it?

JM: No, I just you know saying I was just trying to say how desperate he is as I said no matter what he offers whether it's $10,000.00 or a thousand it doesn't change my mode of going about it and again I'm confined with what I'm given and so in his case he's saying well you know I give you another, if you can get me back in Florida you get another thousand so I said well worse I could do is say is give it to charity. * * *

[There followed a discussion of making the sentence concurrent with a Florida sentence, something highly improbable.]

KC: That's why I thought the conversation yesterday sounded like something that could be suggested by a desperate man who realizes he's gonna ...

JM: The words never passed ... the first time even thought of the word bribe was when you said.

KC: What I said what?

JM: When you said "you're not suggesting a bribe, are you?" The I thought about that a little later, and even though I was being facetious, I guess probably it's, it's improper even to say it in jest.

\*       \*       \*       \*       \*       \*       \*       \*

[There followed an explanation by the prosecutor that even if in jest, he would have to withdraw his prior plea offer.]

KC: Well, in terms of the seriousness with which I regard the case, I haven't changed a bit and in light of what we're just talking about now, and in light of the conversation that we had on the phone, whether you say it was in jest or not, I think ...

JM: Well, you know me well enough, K., I mean, do you honestly think that I would suggest corruptibility to you? I mean really let's be honest.

KC: Nothing really surprises me, I guess.

JM: Nothing can, but I mean again you have a hunch about people, I mean is there anything about this case that could suggest that I'm using that as leverage or whatever. I mean honestly, K., I have made a statement I know I made it to Charlie [respondent's client], I made it to several people I know that as far as you are straight as an arrow when it comes to enforcing the law and like I have spoken highly of you. * * *

[Respondent explained again how the whole question of the extra $1,000 had come up.]

KC: Well, just even the suggestion of a ...

JM: Honestly, take that as a oath to holy heaven between us, I had no intention at all.

KC: Hm hm, once, I regard this business, as you apparently sense as, a, in some ways sort of being a calling and even to have something like that come up

in the most casual way, is something that offends me to the depths, and it's just the kind of business I don't think we can afford that.

    *        *        *        *        *        *        *        *

KC: Well, regardless of that, you may very well have been just joking about it and I accept your representation at this point that you were, but I think that once that's out on the table, even just between us, the fact then becomes that I can't afford to recommend anything to the Court. Once it's even jokingly suggested, in an offhand manner. * * *

Following the transcription of the intercepted conversation, the matter was presented to the Attorney General's office. That office advised the county prosecutor that the chance of "successful criminal prosecution is minimal, particularly in light of Mr. Milita's explanation of his remark * * * [in the] recorded conversation." The Attorney General's office suggested that the appropriate thing would be to refer the matter to the District Ethics Committee for whatever action the committee thought was appropriate. The District Ethics Committee and the DRB concluded that the respondent attempted to offer the assistant prosecutor a bribe but was dissuaded from pursuing the offer by the strong censure of the prosecutor.

We must independently satisfy ourselves by a clear and convincing standard of proof that respondent did, in fact, attempt to bribe the assistant prosecutor. Several factors lead us to conclude that the proofs fall short of meeting that standard. First, this prosecutor was the least likely target for such an overture. The prosecutor was known, even to the respondent, to be "as straight as an arrow." Second, the transcript of the recorded conversation of September 16 conforms with Mr. Milita's version of the first conversation. It is true that respondent may have feigned that he was jesting on the 15th, but it is highly unlikely that he would have anticipated that an assistant prosecutor, going over a variety of files at a pretrial conference, would be recording the conversation. Yet there is nothing in that conversation that is inconsistent with his version of the conversation of the 15th. He admits and agrees that $1,000 was mentioned with respect to giving it to charity. He agrees as well that, whether facetious or in jest, such conduct in the

course of pretrial discussion of a criminal case is improper. Finally, a recorded conversation with his client, admitted into evidence before the DRB, confirms the bizarre discussion about the $1,000 and the offer to give that money to charity.

The distinction, however, between criminal conduct and unethical conduct is critical. If, indeed, the defendant were shown to have engaged in criminal conduct involving bribery of a public official, the penalty would almost certainly be disbarment. *See In re Verdiramo*, 96 *N.J.* 183 (1984); *In re Hughes*, 90 *N.J.* 32 (1982).

What we perceive in respondent's conduct is not corrupt criminal motive but a casual unconcern for the high degree of professionalism expected of every member of the bar. For although respondent may have thought his conduct was in jest and did not have a corrupt criminal motive, his conduct gave that impression. We have always emphasized that not only impropriety but "even the appearance of impropriety" that casts doubt upon the integrity of the criminal process must be avoided. *State v. Galati*, 64 *N.J.* 572, 576 (1974); *see* Rules of Professional Conduct, RPC 1.7(c)(2) (New Jersey maintains appearance of impropriety standard).

Upon our independent review of the record, we are clearly convinced that respondent has been guilty of unethical conduct in that his conduct at criminal pretrial negotiations in the matter was prejudicial to the administration of justice, in violation of DR1–102(A)(5), and adversely reflected on his fitness to practice law, in violation of DR1–102(A)(6). (In our disposition, we refer to the Disciplinary Rules that governed the conduct of attorneys at the time of these occurrences. Effective September 10, 1984, the Rules of Professional Conduct of the American Bar Association, as modified by the Court, govern that conduct. *R.* 1:14. *RPC* 8.4 contains provisions equivalent to the Disciplinary Rules involved here.)

This disrespect for the integrity of the administration of criminal justice was manifested as well in the second incident

that the DRB considered. In this matter, respondent was engaged to represent his client on a drug-distribution charge. Respondent admits to an aberration of judgment in his defense of his client. A key witness against his client was in the custody of the police but at a local hospital. Respondent went to the witness's hospital room. The guard asked him what he wanted. Respondent said that he "was there to see" the witness. The guard, believing that respondent was the attorney whom the witness was waiting to see, took respondent into the room saying, "Your attorney is here to see you."

Respondent overheard the guard's remark but did nothing to change the impression that it conveyed. Respondent realized that if he stated his express purpose, the witness would either ask him to leave or take even more damaging action. Respondent explained his intent as follows:

> I didn't want to directly tell him I was his attorney. Then again I didn't want to directly tell him I was not his attorney and so again, I tried to minimize my statements just to indicate that I was investigating the matter and again leave him to his own device as to whether, in fact, what my purpose was in being there.

In respondent's favor is the fact that he immediately recognized the grave impropriety of what he had done, and within approximately one day contacted the public defender's office to inform them of what had transpired. Even though the public defender was not actually representing the witness when interviewed, he was obviously a potential suspect and they were representing him in other matters.

We agree with the DRB that the evidence clearly and convincingly establishes that respondent engaged in conduct involving "deceit and misrepresentation" in violation of DR 1-102(A)(4) to obtain information to assist his client. Silence is often as great a misrepresentation as not. *Berman v. Gurwicz*, 189 *N.J.Super.* 89, 93 (Ch.Div.1981), aff'd, 189 *N.J.Super.* 49 (App.Div.1983). Even though the public defender may not yet have undertaken to represent the witness, respondent knew that it was improper to appear to counsel one who was or would

be represented by another, in violation of DR7–104(A)(2). *RPC* 4:3 now provides:

> In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.

In evaluating the discipline to be recommended, the DRB considered the seriousness of the ethical infraction in light of all the circumstances. In mitigation of respondent's conduct, the Board considered his youth, limited years at the bar, lack of knowledge and appreciation for what he was doing, his familiar and casual relationship with the assistant prosecutor to whom the comment was made, the fact that he did not pursue the offer further, that the matter was not pursued criminally, and finally, his acknowledged overzealous representation of his client.

The Board recommended that the respondent be suspended for a period of two years and that his return to practice be conditioned upon his associating himself with another practitioner for at least two years and until further application to the Board. We temper the Board's recommendation in view of our finding that respondent's conduct, although unethical, did not clearly demonstrate criminal intent.

We therefore view the appropriate discipline as suspension from the practice of law for six months and that his return to practice be conditioned upon his association with another practitioner for at least two years and until further order of the Court. In addition, respondent is to reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

## ORDER

It is ORDERED that VINCENT JAMES MILITA, II, of SEAVILLE, admitted to the bar of this State in 1980, is hereby

suspended from the practice of law for a period of six months and until the further Order of this Court, effective June 8, 1985; and it is further

ORDERED that respondent's restoration to practice will be conditioned upon his association with another practitioner for at least two years and until the further Order of this Court; and it is further

ORDERED that VINCENT JAMES MILITA, II, be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for the cost of stenographic transcripts; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended, disbarred, and resigned attorneys.

*For suspension* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*Opposed* —None.