IN THE MATTER OF DONALD H. MINTZ, AN ATTORNEY AT LAW.

Argued September 10, 1985—Decided January 27, 1986.

*Thomas J. McCormick*, Assistant Ethics Counsel, argued the cause for Office of Attorney Ethics.

*H. Curtis Meanor* argued the cause for respondent (*Lowenstein, Sandler, Brochin, Kohl, Fisher, Boylan & Meanor*, attorneys).

PER CURIAM.

This attorney ethics proceeding was initiated by a complaint filed with the District Ethics Committee. Respondent, Donald H. Mintz, was charged with discussing with a client the possibility of killing another individual. Respondent was also separately charged with discussing with this client the making of a false claim of physical inability to stand trial on pending charges. An additional charge accused respondent of stating that he could arrange for the sale of cocaine. The final charge alleged that respondent also advised his client how to jump bail and avoid detection.

The District Ethics Committee (Committee) determined that respondent's discussion of the possible murder and his statement concerning bail-jumping were in violation of DR 1–102(A)(5) and (6). The Committee concluded, however, that respondent's conduct was not unethical when he discussed a hypothetical sale of drugs and the possibility of a false claim that his client was not physically capable of standing trial. Following an appeal, the Disciplinary Review Board (DRB or Board) agreed with the Committee's findings with respect to the two instances of unethical conduct. The DRB also found that evidence concerning the conversations relating to the sale of cocaine and to making a false claim of physical inability to

stand trial was sufficient to support these charges. The Board concluded that respondent's actions revealed a "disturbing pattern" of unethical conduct. It recommended a public reprimand.

## I.

The ethical offenses of which respondent is accused all emanate from a conversation between respondent and one Anthony Cappolla, which took place in respondent's office on July 23, 1980. We determine from our review of the record that clear and convincing evidence supports the following facts, which accord substantially with the determinations made by the DRB.

Cappolla, who is now deceased, was being used as an informant in connection with investigations of organized crime activities being conducted by the Essex County Prosecutor and the Attorney General. Cappolla had an extensive criminal record and was gathering information for the police in an effort to induce them to drop a number of criminal charges then pending against him.

Respondent first met Cappolla 18 months earlier when he represented him in a municipal court case involving credit-card fraud. Cappolla had falsely informed respondent that he, Cappolla, had murdered someone and anticipated being charged. Sometime after the municipal court proceeding, Cappolla contacted respondent ostensibly to obtain advice with respect to a proposal to sell information to department stores regarding a means of uncovering merchandise theft. Thereafter, Cappolla asked respondent to represent him in this effort. Prior to meeting with Cappolla to discuss the proposed sale of information, respondent learned that these major stores routinely paid for such information. Respondent eventually discovered that these stores already knew about this particular method of theft, and, consequently, Cappolla received nothing for his information.

During their conversation concerning the proposed sale of this information, respondent mentioned that he had a "problem" with a person, but did not discuss the specific nature of his problem or the identity of the person whom it concerned. Cappolla then informed police authorities that respondent was interested in having someone murdered. It was agreed that Cappolla would be wired with a tape recorder during his next meeting with respondent. Cappolla was outfitted with a body recorder when he met with respondent on July 23, 1980.

The individual discussed at this meeting with respondent was Leonard Sherwood, a former client of the respondent. According to the testimony, in 1977 respondent had represented Sherwood and Sherwood's paramour, Linda Eib, who were charged with the sexual abuse of Eib's two young daughters. At that time Sherwood was separated from his wife, Jovina. Respondent advised Sherwood to return to the marital home pending the outcome of the criminal proceedings. Respondent was later informed by Jovina and her sons that Leonard Sherwood, who is approximately 6' 3" in height and weighs close to 300 lbs., had physically abused them and that this problem was exacerbated by his drinking.

Following the dismissal of the indictment against Sherwood and Eib, Jovina Sherwood and her sons left the marital home and went to live with her father. She and the respondent became romantically involved and when Leonard Sherwood learned of this, he began to threaten the lives of both the respondent and Jovina. Respondent gave this information to the police, who made a report concerning one such threatening and abusive conversation. On another occasion, Sherwood arrived at the home of Jovina's father and threatened respondent's life. These encounters and telephone threats became so frequent that at one point respondent wrote a letter to two prosecutors' offices advising them that if he was found dead, Sherwood was the likely suspect.

At the meeting with Cappolla on July 23, 1980, respondent discussed Cappolla's proposed deal to sell to department stores information concerning the theft scam. The two started talking about how a "certain attorney" could be murdered by a woman contract killer from Canada. Before the conversation became more detailed, respondent conducted a pat-down of Cappolla who, in turn, patted down respondent; the two laughed as they did this. Respondent told Cappolla he was not asking that this attorney be murdered, but as to the method by which the attorney could be killed. When Cappolla described the 23-year-old professional murderess, respondent replied, "Can you imagine what dynamite, what dynamite a female, a beautiful female killer would be." Cappolla shifted the conversation to discuss further respondent's "problem." Respondent did not tell Cappolla the name of his "problem," but did say it was the former husband of his girlfriend. Respondent told Cappolla that

[i]t would be easy as hell for your chick to get him out. All she'd have to do it [sic] get on his bus.

Respondent also told Cappolla that the body had to be found. However, he advised Cappolla that he did not want the murder to take place at that time, but would wait and see what the estranged husband did or said after he, respondent, married the ex-wife. Respondent told Cappolla that he had discussed killing Sherwood with his girlfriend, but they decided against it. However, he assured Cappolla that she would not know if he decided to have Sherwood killed because he knew "who to make my partners in what [."] Respondent told Cappolla

[t]he only reason I'm holding you back now, the only reason I'm saying don't do anything now,

. . . . . . . .

The last time he called and he started mouthing off, I said this to him

. . . .

I said to him Lenny, I've been listening to your garbage now for a year and and a half and I've been hearing you threaten my life for a year and a half

. . . . . . . .

I'm tired of it, I'm bored with it

.     .     .     .     .     .     .     .

The next time I hear it,

.     .     .     .     .     .     .     .

Lenny, will be the last time because I tell you this, you call me one more time with this kinda garbage and I'm gonna get ya.

Respondent then told Cappolla that if Sherwood did not create any problems with the wedding or the honeymoon and no longer bothered them, he would have no reason to have him killed, explaining that he did not want to have this on his conscience. Cappolla told respondent that if he were successful with the department store proposal, respondent's "problem" was "guaranteed."

Respondent also told Cappolla that he had represented some Columbians who had a few kilos of cocaine when they were arrested, which they wanted him to sell. Respondent boasted that he had arranged for the sale, but he did not go through with it after reflecting on the fact that he had lived within the law for 46 years, never had to look over his shoulder, and decided he should continue to live that way. Cappolla asked respondent if he would be able to sell ten ounces of cocaine for $15,000 for him. Respondent replied that he could make the deal, probably within 48 hours.

During the conversation, respondent asked when Cappolla had to appear in court again. He suggested Cappolla see his own doctor. Respondent indicated that it required careful thought as to what kind of medical condition Cappolla was going to have, mentioning multiple sclerosis and severe psychological difficulties as possibilities for Cappolla to use to avoid standing trial.

Respondent then asked Cappolla if his wife knew he was looking for runaway money. Cappolla replied she knew he would not be going to court and he would not leave her without money. Respondent informed Cappolla that the police would find him through his family because they would be surveiling

the house and family. He mentioned a fugitive who was arrested in California when he telephoned his family. Respondent advised Cappolla that

> if you don't take them, sooner or later you're gonna come back to be with them, or they're gonna miss you enough to wanta come down and be with you, now when they pack and leave somebody's gonna be on the same plane.

In response to another question, respondent assured Cappolla that there was no extradition treaty with Brazil.

The tape recording of this conversation was delivered to law enforcement agencies, which decided to wait for further developments between respondent and Cappolla. On July 11, 1982, respondent was questioned about this conversation by a Deputy Attorney General, who was reviewing the case. When informed that this conversation with Cappolla had been recorded, respondent candidly answered questions put to him. Respondent admitted he had asked Cappolla if he could kill Leonard Sherwood. He described it in terms of a preemptive strike. He said he was having a problem, felt in danger and believed he had to take action before action was taken against him. He told the Deputy Attorney General that he felt his personal circumstances had contributed to the subject matter of the taped conversation, mentioning in particular the potential loss of his paramour and the great strain he was under, which impaired his judgment. Respondent realized he had made a mistake; he did not deny talking to Cappolla about having someone killed. Respondent said: "Yes, I was soliciting this individual. I'm sorry." Respondent acknowledged that his conduct was improper in advising Cappolla as to how he could successfully jump bail. He denied any serious intention to conspire to commit murder, maintaining that his actions were merely verbal fantasizing.

The law enforcement agencies ultimately concluded that it was not likely that respondent would be convicted of criminal charges based on the tape. Additionally, the informant, Cappolla, died in the early summer 1982. They decided to refer the

tape to the Ethics Committee, but as a result of a misunderstanding, it was not forwarded until mid-1983.

At the Ethics Committee hearing, Dr. Milton D. Fox, a board-certified psychiatrist, who since 1964 had treated respondent at various times, testified that in his opinion, respondent in his conversation with Cappolla was not planning to murder but was putting into words his fantasies, and that Cappolla's statements stimulated the fantasies. Dr. Fox added that

> what ... he was doing here ... was getting a lot off his chest. A lot of his fantasies he was getting into words. That probably did him the kind of good that it could do any of us, ... to experience a catharsis of how we feel about a certain person or situation.

In addition, he believed that respondent regarded Cappolla as a social friend and that respondent often "socialized with his clients."

## II.

It is clear that the conversations between respondent and Cappolla constituted an attorney-client exchange of information and legal advice, as well as a discussion of matters relating to respondent's personal affairs. The respondent by his own admission solicited Cappolla regarding the crime of murder. Respondent was soliciting, albeit in an exploratory and tentative fashion, the promotion of a murder, possibly to be committed in the future. While underlying intentions of respondent, as inferred from the conversation itself, could be considered to be equivocal and ambivalent, his communication is hardly ambiguous in its meaning. It clearly is to be understood as the solicitation to commit the crime of murder.

Respondent contends that he was only fantasizing. He asserts that fantasizing is characteristic of all persons and is "normal." The testimony of his doctor supports this contention. We could agree that respondent may have been fantasizing, which is a common characteristic of human behavior. "Fantasy is one of the commonest forms of substitute behavior. * * * Fantasy may take the form of plans as well as day

dreams." H.C. Lingren and D. Byrne, Psychology: *An Intro-duction to the Study of Human Behavior* (1960) at 243–44. Moreover, the record suggests that respondent did not intend to give legal advice as such or that his advice should be taken seriously. Rather, the record conveys the impression that respondent was bragging or posturing.

These considerations do not alter the improper quality of respondent's conduct. That respondent was fantasizing or engaging in some odd form of professional puffing does not alter the tenor or meaning of his remarks. *See Matter of Milita*, 99 *N.J.* 336, 342 (1985) ("For although respondent may have thought his conduct was in jest and did not have a corrupt motive, his conduct gave that impression."). Respondent is not charged with having improper thoughts. His personal thoughts, secret motives or subconscious feelings, even if at variance with his words, do not change those words or the meaning they convey. *Ibid.* Respondent is accused of making statements with respect to the possibility of arranging a murder—as well as the drug transaction—that can fairly and objectively be understood to constitute the solicitation of the commission of crimes. The evidence abundantly supports the accusation. We conclude that this conduct is prejudicial to the administration of justice in contravention of DR 1–102(A)(5) and adversely reflects on respondent's fitness to practice law in violation of DR 1–102(A)(6).

Respondent's advice to Cappolla as to how he could "jump bail," taking his family with him to avoid apprehension when he fled the jurisdiction, contravened DR 7–102(A)(7). This provides that a lawyer may not "[c]ounsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent." To the extent that respondent did not intend his remarks to constitute advice to a client, it nevertheless had all of the indicia of improper counselling. His communication is one that reasonably could be understood to convey improper advice. This conversation clearly violated DR 1–102(A)(5). It also reflects

adversely upon his fitness to practice law, in violation of DR 1–102(A)(6).

Similarly, respondent's comments about how to avoid standing trial with a false medical report must be viewed as part of the totality of this situation and must be considered from the same perspective. These comments could readily be construed as serious advice by respondent to his client to evade the jurisdiction of the court and to arrange for the commission of crimes. That this may not have been defendant's intent does not alter the tenor and possible effect of the communication. *Matter of Milita, supra* 99 *N.J.* 336; *see In re Greenberg,* 80 *N.J.* 503, 504 (1979). In so doing respondent violated DR 1–102(A)(5) (conduct prejudicial to the administration of justice) and DR 1–102(A)(6) (adversely reflects on his fitness to practice law).

We have repeatedly stressed that an attorney must, at all times, uphold and honor the law. *In re Schleimer,* 78 *N.J.* 317, 319 (1978); *In re Genser,* 15 *N.J.* 600 (1954). Respondent's conduct, when viewed in its totality, betrayed a disrespect bordering on contempt for the law. At the very least, respondent exhibited a recklessness, irresponsibility and indifference as to how his professional conduct could be perceived by others and the impact of that perception upon the standards of behavior applicable to all lawyers. Respondent by his conduct detracted materially from the honesty, integrity, and dignity that are the hallmarks of the legal profession. Were it not for the absence of a culpable state of mind, demonstrated by the evidence that respondent was engaging in fantasy and braggadocio, rather than giving legal advice as such or actually soliciting the commission of a crime, respondent could well have been charged with a crime. *See Matter of Milita, supra,* 99 *N.J.* 336.

In determining the appropriate discipline to be imposed in this case, we acknowledge, as did the Board, that respondent has an unblemished record. He has been a member of the Bar since

1955, served as an assistant prosecutor for four years, and has no record of prior disciplinary action. We also are unable to conclude by clear and convincing evidence that respondent actually intended to commit or have his client commit any of the criminal acts that were the subject of his conversation. The absence of such a nefarious intent in the circumstances can justify the withholding of an extreme disciplinary sanction, such as disbarment. *Compare Matter of Milita, supra,* and *In re Mirabelli,* 79 *N.J.* 597 (1979), *with In re Verdiramo,* 96 *N.J.* 183 (1984) and *In re Hughes,* 90 *N.J.* 32 (1982). Nevertheless, the absence of an improper intent or motive does not eradicate the highly improper nature of the conduct or obviate the need for significant discipline. As noted, respondent's remarks were capable of being understood literally. Respondent's discussion of murdering another person, raising a false claim of physical inability to stand trial, cocaine selling, and jumping bail constituted unethical conduct prejudicial to the administration of justice, in violation of DR 1–102(A)(5) and adversely reflecting on his fitness to practice law, in violation of DR 1–102(A)(6).

We accordingly consider appropriate discipline as suspension for two years. Respondent's return to practice shall be conditioned upon a medical report of a competent psychiatrist relating to respondent's personal fitness to resume the practice of law without a repetition of the kind of conduct that occurred here, and until further order of the Court. In addition, respondent is to reimburse the Ethics Financial Committee for administrative costs.

*For Suspension* —Chief Justice WILENTZ, and HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.

## ORDER

It is ORDERED that DONALD H. MINTZ of EAST OR-ANGE, who was admitted to the bar of this State in 1954, be suspended from the practice of law for a period of two years

and until the further order of this Court, effective February 18, 1986; and it is further

ORDERED that DONALD H. MINTZ be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that any restoration to practice shall be conditioned upon a demonstration of respondent's medical and mental fitness to resume the practice of law; and it is further

ORDERED that DONALD H. MINTZ comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys; and it is further

ORDERED that DONALD H. MINTZ reimburse the Ethics Financial Committee for appropriate administrative costs.