**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2210-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

BLAKE CLAY,

     Defendant-Appellant.

_____

Argued October 20, 2021 – Decided August 10, 2022

Before Judges Fuentes, Gooden Brown and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 18-02-0118.

Joshua Altman argued the cause for appellant (Benedict and Altman, attorneys; Joshua Altman, on the brief).

Meredith L. Balo, Assistant Prosecutor, argued the cause for respondent (William A. Daniel, Union County Prosecutor, attorney; Meredith L. Balo, of counsel and on the brief).

PER CURIAM

Defendant Blake Clay was a Union County Police Department (UCPD) police officer and an avid toy collector. He was charged in a three-count indictment with third-degree official misconduct, N.J.S.A. 2C:30-2(a); third-degree theft by deception, N.J.S.A. 2C:20-4; and third-degree theft, N.J.S.A. 2C:20-3(a). After losing his motions to disqualify the Union County Prosecutor's Office (UCPO) from prosecuting the case, defendant was tried by a jury and convicted of all three counts. He was sentenced to an aggregate term of three years' imprisonment, with a two-year period of parole ineligibility. The parole ineligibility period was mandated under N.J.S.A. 2C:43-6.5 for the official misconduct conviction.

The convictions stemmed from defendant's theft of toy action figures on twelve occasions in 2016 from various Walmart and Target stores. Defendant affixed fake barcode stickers to the figures and purchased them at reduced prices. During some of the incidents, defendant was wearing his police uniform, and, on one occasion, informed loss prevention store personnel that he was a police officer when they threatened to call the police. The proofs adduced by the State at trial included expert testimony about the identity and fair market value of some of the items defendant purchased. Defendant testified and

2

claimed he found the items with the barcode stickers already attached. Through the scheme, defendant cheated Walmart and Target out of over $500.

In this ensuing appeal, defendant makes the following arguments:

LEGAL ARGUMENTS

I. THE TESTIMONY OF MATTHEW ZAITZ SHOULD HAVE BEEN PRECLUDED AT TRIAL BECAUSE IT IS A NET OPINION AND THE FOUNDATION UPON WHICH THE PURPORTED EXPERTISE RELIES IS INSUFFICIENT UNDER N.J.R.E. 702 AND 703.

II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN LIMITING THE TESTIMONY OF [DEFENDANT], PREVENTING HIM FROM PRESENTING A DEFENSE IN VIOLATION OF HIS SIXTH AMENDMENT RIGHTS.

A. The Trial Court Prevented [Defendant] From Presenting A Defense When It Did Not Allow Testimony Concerning His Own State Of Mind About Walmart's Pricing.

B. The Trial Court Committed Reversible Error When It Prevented [Defendant] From Testifying On Issues And Facts That Reveal State Of Mind And Improperly Limited His Ability To Present A Defense.

C. The Convictions Against [Defendant] Must Be Reversed Because The Cumulative Error Of Precluding Relevant State Of Mind Evidence Necessary To

3

Defend Against The Charges While Including The Net Opinion Of Matthew Zaitz Deprived [Defendant] Of A Fair Trial.

III. A RECUSAL OF THE [UCPO] WAS NECESSARY TO ENSURE THAT [DEFENDANT] RECEIVED A FAIR AND IMPARTIAL TRIAL.

A. Recusal Of The [UCPO] Was Necessary To Avoid A Conflict Of Interest Because The Prosecuting Agency Acquired Information That Would Not Otherwise Have Been Obtained But For [Defendant's] Employment With Both The UCPD And UCPO.

B. The Tortuous History Of [Defendant] With Numerous Individuals Who Participated In His Criminal Investigation And Prosecution Necessitated That The UCPO Be Recused To Preserve Fairness And Impartiality During The Entire Criminal Prosecution.

i. The Substantial Participation Of Lieutenant John Kaminskas In Investigating, Prosecuting And Adjudicating Numerous Internal Affairs Complaints Against [Defendant] While Also Participating In His Criminal Prosecution Assisting The UCPO Required Recusal Of The UCPO.

4

ii. The Involvement Of Lieutenant Dean Marcantonio In The Investigation Of [Defendant's] Notice Of Claim And Continued Involvement With The Criminal Investigation And Prosecution Of [Defendant] Created A Conflict Of Interest Necessitating A Recusal Of The UCPO.

iii. The Continued Involvement Of Captain Vincent Gagliardi Of The UCPO In The Criminal Prosecution Of [Defendant] While Being Involved In The Investigation Of The Notice Of Tort Claims Presented An Inescapable Conflict Requiring Recusal Of The UCPO.

IV. THE CONVICTION OF [DEFENDANT] SHOULD BE REVERSED BECAUSE THE COURT COMMITTED REVERSIBLE ERROR WHEN IT DID NOT INQUIRE OF DEFENDANT OR COUNSEL ABOUT HIS RIGHT TO TESTIFY OR RIGHT NOT TO TESTIFY.

V. THE DEFENDANT SHOULD HAVE BEEN ACQUITTED ON ALL COUNTS BECAUSE THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

Having reviewed the arguments in light of the record and governing legal principles, we affirm.

I.

We glean these facts from the six-day jury trial conducted in September 2019, during which the State produced six witnesses. Defendant testified and presented one witness.

At approximately 5:30 p.m. on March 19, 2016, defendant was stopped by loss prevention personnel at a Walmart in Edison for allegedly affixing fake barcodes to seven action figures and purchasing them at a reduced price using the self-checkout. On that date, Jaime Troya, "an asset protection officer" at Walmart, watched defendant as he shopped in a toy aisle that was not monitored by security cameras. At the time, defendant was employed as a UCPD police officer but was not in uniform.

Troya testified that based on his observations, defendant appeared to remove something from his pocket and place "something onto the box" containing each action figure before "placing it back into his basket." Troya called his supervisor, Herbert Parada, and informed him of his observations. As defendant walked to the self-checkout aisle, Troya positioned himself where he could see defendant scanning the items "on the side, exactly where [he] had seen

[defendant] place something." Defendant purchased the seven action figures using a credit card. Each item rang up as a "Vision vs. Sub-Ultron" toy for $1.50 each, totaling $10.50, even though none of the figures was a Vision vs. Sub-Ultron figure.

As defendant exited the store, Troya asked defendant to accompany him to an office where Parada joined them. Troya took the merchandise from defendant and "explain[ed] to him that" "price switching" was "a form of shoplifting." Parada and Troya removed the unauthorized barcode stickers from the boxes and stuck them onto a piece of paper. Troya then took the seven items back to the register and scanned the original barcodes printed on the boxes. The subtotal, before tax, was $119.11.

Both Troya and Parada testified that the barcode stickers they removed from defendant's purchases did not look like Walmart stickers, and they had never seen stickers of that type on products at Walmart. Walmart used clearance stickers with a "yellow tag" printed on-site. Troya said the barcode stickers recovered from defendant's purchases "looked like [they were] printed off of someone's computer at home."

According to Troya, defendant claimed that he found the items with the stickers already on them. However, Troya testified that the items defendant

7

scanned were not taken from Walmart's clearance section. Similarly, Parada testified that defendant "stated that all of the toys in that aisle had that sticker." However, when Parada went to the toy aisles to investigate defendant's claim, he found "no other . . . toy with that sticker" among the action figures.

Troya testified that when he mentioned calling the police because of the amount involved, defendant said, "he was a police officer," and "would rather resolve this another way." Defendant added "he knew the price of the items" and could "pay[] for [them] just to get it over with." Troya recalled that although defendant was calm and did not show a badge during the interaction, defendant "repeat[ed] the fact that he was an officer." Likewise, Parada testified that after telling defendant that "we might have to call the police," defendant stated "you know, it's not a big deal. I'll go ahead and pay for it. . . . I'm on the job." When Parada asked defendant what that meant, defendant responded that "he was an officer."

Sometime later, an Edison police officer responded to the Walmart and arrested defendant. Upon arrival at the Edison police department, UCPD was notified of defendant's arrest. Once the UCPO learned of defendant's arrest, it assumed responsibility for the ensuing investigation, which was handled by

Detective Lieutenant Cassie Kim, then a Sergeant in the Special Prosecutions Unit of the UCPO.

Kim subpoenaed Walmart for a list of all purchases made between January and April of 2016 that scanned as "Vision vs. Sub-Ultron" toys. "[A] majority of the purchases were made by one account number." Kim testified she confirmed that defendant made the purchases by comparing the records obtained from Walmart with defendant's credit card statements. She was also "able to match the transaction receipts and records with . . . surveillance videos" of defendant checking out at Walmart on the specified dates. Those videos were played for the jury, including the March 19, 2016 purchases that immediately preceded defendant's arrest.

According to Kim, the first purchase occurred at 3:57 p.m. on February 11, 2016, at a Walmart in Linden. Security camera footage showed that defendant had a small child with him. Defendant purchased six items – four items appeared on the receipt as "Vision vs. Sub-Ultron" toys for $4.50 each, and two items scanned as Marvel figures for $19.87 each. Minutes later, defendant made a second purchase of two items that scanned as "Vision vs. Sub-Ultron" toys. Later that day, at 6:37 p.m., defendant returned to the Linden Walmart and made a third purchase of six items – five scanned as "Vision vs.

9

Sub-Ultron" toys, and one scanned as a "Captain America Agents of Shield" figure.

Defendant made similar purchases at the Linden Walmart on four more occasions – February 21 and 23, and March 17 and 19. On February 21, 2016, at 11:41 a.m., defendant purchased two items that scanned as "Vision vs. Sub-Ultron" toys. Defendant was on duty and wearing his UCPD uniform at the time. On February 23, 2016, at 10:56 a.m., defendant purchased another item that scanned as a "Vision vs. Sub-Ultron" toy. On March 17, 2016, at 2:01 p.m., defendant purchased five items, four of which scanned as "Vision vs. Sub-Ultron" toys. At 7:33 a.m. on March 19, 2016, prior to his arrest at the Edison Walmart later in the day, defendant purchased four items, three of which scanned as "Vision vs. Sub-Ultron" toys. Defendant was in uniform when he made the purchase.

Additionally, at the Edison Walmart, on February 23, 2016, defendant purchased two novelty lamps that scanned as "Vision vs. Sub-Ultron" toys. The following day, February 24, at a Walmart in Woodbridge, defendant purchased two more toys that scanned as "Vision vs. Sub-Ultron" toys.

Kim testified that defendant made all the aforementioned Walmart purchases from the self-checkout registers. However, on cross-examination, she

10

acknowledged that defendant made purchases on February 25, 2016, at the Walmart in Watchung using an actual cashier. The parties stipulated that the February 25 purchases "rang up as the Vision vs. Sub-Ultron toy at issue in th[e] case." Kim also acknowledged on cross-examination that although she learned during the investigation that the same sticker at issue appeared on a Batman toy in a different Walmart store, she took no action to further investigate the information.

Kim did, however, investigate purchases that defendant made at a Target in Clark and identified two instances of "inappropriate" purchases in April of 2016 from records subpoenaed from Target. Kim testified that her lieutenant at the time, Dean Marcantonio, told her that defendant was "a frequent customer at th[at] Target store," but she was unsure how Marcantonio learned that information. Kim was also told by a retired UCPD officer, John Kaminskas, that defendant "shopped in the Clark Target." Kim learned that the source of that information was "county police gossip and grapevine."

Edward Daisey, who worked as a retail theft investigator for Target in 2016, confirmed that on April 13, 2016, defendant purchased an item priced at $39.99 for $2.99. Based on security footage, Daisey identified the item that defendant purchased as Target item number 087064567. However, it scanned

11

as item number 087071422.  Defendant made an identical purchase on April 22, 2016.  Daisey testified that Target did not change barcodes on items that were on sale.  Rather, if an item was on sale, it would be indicated on the receipt.

The State produced Matthew Zaitz, who was qualified as "an expert in the field of buying, selling, and pricing of action figures."  Zaitz identified the items defendant purchased from reviewing security footage of defendant checking out at the register.  Zaitz testified that none of the items defendant purchased at the Linden or Woodbridge Walmart stores were Vision vs. Sub-Ultron figures, despite the items having scanned as such.  Zaitz opined that the "fair market value" of the action figures defendant actually purchased was about twenty dollars each.  Zaitz also noted that the action figures he identified were recent releases when defendant purchased them and that his value estimates did not account for appreciation, which would normally occur over time.

During the investigation, the UCPO found several YouTube videos defendant had created under the name "the Ultimate Toy Collector."  In some of those videos, which were played for the jury, defendant himself priced three of the figures Zaitz identified at "about $19.99" each.  Defendant only paid between $1.50 and $4.50 for each of the figures, depending on the price assigned to the "Vision vs. Sub-Ultron" toy on a given day.

12

Zaitz priced two of defendant's other purchases at a higher value. Zaitz opined that the fair market value of the "Scooby-Doo . . . Mystery Machine" was between thirty and forty dollars, and the fair market value of the "Ninja Turtle Party Wagon" was between fifty and sixty dollars. Zaitz stated the higher price would likely be charged at "a mom-and-pop type of store," while the lower price would be charged at a "big-box store like . . . Walmart" which "most likely get[s] a bigger discount than the smaller stores."

Zaitz's opinion on the fair market value of the items was based on their "manufacturer suggested retail price" (MSRP), online searches, and his experience selling toys. He acknowledged that "[i]f Walmart popped up" during his online searches, he "didn't directly go to Walmart," and he testified that he had never worked at Walmart and had no knowledge of Walmart's "model for discounting" items.

During his testimony, defendant denied all the charges. Defendant denied fabricating any barcodes or placing anything on the merchandise when shopping at Walmart and claimed he had previously seen barcodes like those found on his March 19, 2016 purchases. Similarly, defendant denied putting false labels on anything at Target and, contrary to Daisey's testimony, defendant claimed he

13

had "[seen] multiple items" at Target with barcode stickers on them, indicating the items were on sale.

Defendant also denied using his position or his child to avoid detection. When asked why he would shop while in uniform and on duty, defendant explained that it was partly because Walmart stores were convenient restroom stops while "work[ing] a highway corridor," and because it provided "a police presence so that shoppers, or just people in general, would feel a little safer." He denied appearing in uniform to "distract anybody or dissuade them from engaging" with him. He testified that he told Troya and Parada that he was a police officer because "they asked [him] what [he] did for [a] living." Defendant also stated it was "protocol" to identify oneself as an officer before police arrive "because another police officer is going to want to know if you have a weapon on you."

Defendant acknowledged being an avid toy collector and admitted that he shopped for toys several times per week. He confirmed that he ran an "Ultimate Toy Collector" YouTube channel, consisting of "shopping videos," toy reviews, interviews, and giveaways. Defendant admitted that he purchased toys on the dates depicted in the videos and admitted that items he purchased were "labeled" Vision vs. Sub-Ultron, notwithstanding the fact that he never purchased a

14

"Vision vs. Sub-Ultron" figure. Defendant explained that "Vision" was a "Marvel character" in the "Age of Ultron" movie released in early 2015.

Defendant also testified that after he was arrested, while shopping, he would look for "items which were similar" to those he was accused of stealing, with stickers like those he was accused of fabricating. Defendant claimed that about a year after his arrest, on April 21, 2017, while shopping at a Walmart in Woodbridge, he found and purchased two action figures with "the exact same bar code as the items[] which [he] was accused of . . . stealing." He paid three dollars for each figure. The figures were admitted into evidence at trial. James O'Connor, a private investigator hired by the defense, testified that in early 2017, he too found a toy at Walmart, a "Mrs. Potato Head" that was marked down to four dollars and misidentified as a "Hulk" toy.

## II.

In this ensuing appeal, defendant first contends that the trial judge erred in admitting Zaitz's expert testimony, arguing that Zaitz was not qualified under N.J.R.E. 702 and N.J.R.E. 703, and that his testimony constituted an impermissible net opinion.

The judge conducted a Rule 104 hearing on July 18, 2019, to determine the admissibility of Zaitz's testimony as an expert to identify the toys defendant

15

purchased "during eight . . . of the twelve . . . alleged thefts, as well as the fair market value of the toys at the time of the thefts." The State did not proffer Zaitz's testimony to establish the loss amounts from the Edison Walmart on February 23 or March 19, 2016, when defendant was arrested, or to establish the loss amounts from Target.

At the hearing, Zaitz testified he was a toy collector since childhood and opened a toy store in 2010. Zaitz was the sole operator of the store, which mostly sold action figures, including Marvel and DC superhero figures. The store closed after a fire in 2012, but Zaitz reopened the store a "few months" later in a different location.

Zaitz ran the store's day-to-day operation and did all the purchasing. The store's merchandise consisted of a "50/50 split between" older collectibles and new toys. Zaitz purchased older toys from individuals on the secondary market, while newer toys were purchased through "wholesale accounts . . . directly from . . . distributor[s]." Zaitz estimated that ninety percent of the store's business was buying and selling action figures. However, he explained that he "kind of backed away from action figures and toys in about spring of 2018" because there was "too much competition." He closed the store in April of 2019.

Zaitz testified that, throughout the years, he engaged with the toy community by attending Toy Fair, an annual industry convention exclusively for tradespeople; New York Comic-Con, an annual multi-day convention open to the public; and "local toy shows." He also engaged with online communities in private forums and Facebook groups where "people buy, sell, [and] talk about new stuff" related to action figures.

Regarding Zaitz's process for identifying defendant's purchases, he testified that the "boxes for these types of toys" were "distinct" and "easily recognizable." He explained:

> A lot of the items in the videos I could clearly see what . . . label they were, if it said Marvel on the box and stuff like that, and from there I was able to zoom in on each image and . . . bring it over into eBay, specifically looking in the toy category, to get a positive ID on . . . what the item actually is.

Zaitz explained that Marvel and DC were "[t]wo different [competing] companies" that manufactured a long-running line of action figures and "release[d] multiple series" of the figures "throughout the year." Examples of Marvel action figures "would be Spider-Man, Iron Man, Captain America, Avengers, all of the big blockbusters that you see in the movie theaters." Examples of DC action figures "would be Superman, Batman, [and] Wonder Woman."

17

Regarding pricing, in the course of his business, Zaitz would determine how to price older toys by searching for what they "actually sold for" on eBay. On the other hand, all the newer toys were assigned a "suggested retail price" by their manufacturers, referred to as the MSRP. According to Zaitz, although the price ranges he gave were based on their MSRP, he considered that "a collectible store in general would always charge a little more as opposed to a big box store."

Zaitz testified that he determined the value of defendant's purchases based on the MSRP of the figures, explaining that the retail pricing of Marvel Legends and DC Multiverse figures "held pretty steady . . . at around [twenty dollars]" for years and might have gone up or down in suggested retail price by only "a couple dollars." He priced the Ninja Turtle Party Wagon at fifty to sixty dollars and the Scooby Doo Mystery Machine between thirty and forty dollars. In contrast, Zaitz stated that the Vision vs. Sub Ultron characters sold for five or six dollars.

Zaitz testified that he did not go to Walmart's website to determine the prices of these items because "Walmart's website is made up of [fifty] percent third-party resellers," and the listing would "most likely be [someone] reselling it" instead of Walmart's own listing for the item or Walmart's price for the item

in 2016. Because Zaitz had no direct experience with the sales practices of big box stores, he could not say what Walmart paid for the toys it sold but testified that he could still assess their value "because everyone gets a suggested retail price." When asked if he knew what Walmart would do "if they're stuck with items for too long," Zaitz responded that "they would, just like every other stor[e], most likely clearance them out at some point."

Following the hearing, the judge issued a written opinion on July 31, 2019, qualifying Zaitz as an expert pursuant to N.J.R.E. 702 and admitting his testimony under N.J.R.E. 703. The judge determined the subject matter was "beyond the ken of the average juror," Zaitz was "knowledgeable in the toy market and . . . acutely familiar with the many types of action figures sold at the time of the alleged thefts," and Zaitz's "opinions regarding the identity of the products purchased" as well as "the estimated prices of those products," were "sufficiently reliable and more than a 'net opinion.'" However, the judge precluded Zaitz from testifying regarding "the placement" and "types of barcode stickers used at the stores," as well as the likelihood that defendant "printed a fraudulent barcode or continuously reused a legitimate barcode." The judge reasoned that Zaitz "did not testify to any knowledge base at Walmart or Target which would allow him to testify about the types of barcode stickers used at the

stores, or the placement of the barcodes on the products," and "the witness's opinion that . . . defendant likely printed a sticker or reused a legitimate sticker . . . include[d] an impermissible conclusion about the defendant's guilt."

"'[A] trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion . . . .'" State v. Nantambu, 221 N.J. 390, 402 (2015) (alteration in original) (quoting State v. Harris, 209 N.J. 431, 439 (2012)). Thus, "[w]e will not substitute our judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" State v. Garcia, 245 N.J. 412, 430 (2021) (quoting State v. Medina, 242 N.J. 397, 412 (2020)). "Every mistaken evidentiary ruling, however, will not lead to a reversal of a conviction. Only those that have the clear capacity to cause an unjust result will do so." Ibid. This deferential approach applies to both a trial court's ruling on "the competency of a witness to testify as an expert," Carey v. Lovett, 132 N.J. 44, 64 (1993), and "'a trial court's decision to admit expert testimony,'" Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011)).

The admissibility of expert testimony is governed by N.J.R.E. 702, which provides:

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand the

evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

The rule imposes three requirements for the qualification of an expert and the admission of his or her testimony:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [State v. Jenewicz, 193 N.J. 440, 454 (2008).]

"The party offering the expert testimony has the burden of proof to establish its admissibility." State v. Rosales, 202 N.J. 549, 562 (2010). "[T]he Rule 104 hearing is a favored means to create a record for appellate review of a disputed decision." State v. Torres, 183 N.J. 554, 567 (2005).

N.J.R.E. 702's "requirements are construed liberally in light of [the rule's] tilt in favor of the admissibility of expert testimony." Jenewicz, 193 N.J. at 454. "The rationale for th[e second] requirement is that expert testimony seeks to assist the trier of fact. An expert opinion that is not reliable is of no assistance to anyone." State v. Kelly, 97 N.J. 178, 209 (1984). Although this prong is framed as requiring that "the field testified to . . . be at a state of the art such

that an expert's testimony could be sufficiently reliable," Jenewicz, 193 N.J. at 454, the subject of an expert's testimony and the methods relied on need not be of a scientific nature, see State v. Hyman, 451 N.J. Super. 429, 446-48 (App. Div. 2017) (holding that expert testimony about the meaning of drug slang is permissible). Ultimately, the question is whether an expert "applied a reliable methodology," id. at 448, based on "knowledge, skill, [or] experience" in an area of "specialized knowledge," N.J.R.E. 702.

Furthermore, "[a]lthough proffered testimony cannot be based upon unreliable scientific techniques, expert testimony should not be rejected merely because it is not completely accurate and reliable. Nearly every case contains variables which may affect an expert's conclusion, and the validity of that opinion should be determined by the jury." State v. Swed, 255 N.J. Super. 228, 246 (App. Div. 1992) (citation omitted).

With respect to the third requirement—"the individual's expertise to speak on a topic as an expert witness—our trial courts take a liberal approach when assessing a person's qualifications." Jenewicz, 193 N.J. at 454. Indeed, "courts allow . . . vulnerabilities in an expert's background to be explored in cross-examination and avoid using such weaknesses as a reason to exclude a party's choice of expert witness." Id. at 455. For example, in State v. Krivacska, 341

N.J. Super. 1, 32-33 (App. Div. 2001), we upheld the trial court's decision to permit a psychologist to give an expert opinion about a "mentally handicapped" person, even though the psychologist did not specialize in evaluating mentally handicapped people and had no experience with the cognitive impairment at issue. While we "recognize[d] the deficiencies in [the psychologist's] qualifications," we "perceive[d] no abuse of the judge's discretionary powers." Id. at 33.

Similarly, in State v. Moore, 122 N.J. 420, 457-60 (1991), the Court found no error where the trial court qualified a crime scene investigator, with two years of experience in his field but only two days of training "in blood-spatter analysis," to testify as a blood-spatter expert. The Court reasoned that "blood-spatter analysis submits all the basic data to the trier of fact for exercise of its judgment" and that "[t]he defense highlighted the witness's lack of specific training and experience both on cross-examination and in summation, allowing the jury to assess the value of his testimony." Id. at 460.

Even if qualified under N.J.R.E. 702, an expert is not permitted to tender an opinion that is "not supported by factual evidence or other data." State v. Townsend, 186 N.J. 473, 494 (2006). Indeed, N.J.R.E. 703 requires that expert opinion be grounded in "'facts or data derived from (1) the expert's personal

observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence[,] but which is the type of data normally relied upon by experts.'" Biunno, Weissbard & Zegas, <u>Current N.J. Rules of Evidence</u>, cmt. 1 on N.J.R.E. 703 (2022). The "net opinion" rule is a corollary of N.J.R.E. 703 and "requires an expert to give the why and wherefore of his or her opinion, rather than a mere conclusion." <u>Townsend</u>, 186 N.J. at 494 (quoting <u>Rosenberg v. Tavorath</u>, 352 N.J. Super. 385, 401 (App. Div. 2002)).

Nonetheless, "[t]he net opinion rule is not a standard of perfection." <u>Townsend</u>, 221 N.J. at 54. While a conclusion "'based merely on unfounded speculation and unquantified possibilities'" must be excluded, simple omissions in an expert's analysis--like the failure to "'account for some particular condition or fact which the adversary considers relevant'"--may instead be a "'subject of exploration and cross-examination at a trial.'" <u>Id.</u> at 54-55 (first quoting <u>Grzanka v. Pfeifer</u>, 301 N.J. Super. 563, 580 (App. Div. 1997); then quoting <u>Creanga v. Jardal</u>, 185 N.J. 345, 360 (2005); and then quoting <u>Rosenberg</u>, 352 N.J. Super. at 402).

Here, in qualifying Zaitz as an expert, the judge properly concluded Zaitz's testimony satisfied N.J.R.E. 702 and 703. The judge considered Zaitz's years of

professional and personal experience buying, selling, and collecting toys and the methodology he used to identify and valuate defendant's purchases. Defendant does not appear to challenge the first requirement of N.J.R.E. 702 – that Zaitz's intended testimony concerned a subject beyond the ken of the average juror. Instead, he contends that because Zaitz "was entirely unfamiliar with the pricing and discounting policies of a big box store like Walmart," the second prong, reliability, and the third prong, qualifications, were not met.

However, as a result of the judge's ruling delimiting Zaitz's testimony, Zaitz only testified about the identity and "fair market value" of toys defendant purchased. Zaitz did not testify regarding Walmart's purchasing, pricing, or discounting practices. Moreover, defense counsel brought Zaitz's lack of specific knowledge in this area to the attention of the jury through extensive cross-examination. "That the strength of an individual's qualifications may be undermined through cross-examination is not a sound basis for precluding an expert from testifying . . . ." Jenewicz, 193 N.J. at 455.

Defendant's argument that Zaitz offered a net opinion is equally unpersuasive. Defendant contends that Zaitz's testimony lacked foundation because "he relied upon the approximate retail value of the toys in 2016 or the MSRP," while Walmart "may not even have adhered to the MSRP or the fair

market value in . . . pricing items."  However, Zaitz provided "'the why and wherefore of his . . . opinion,'" Townsend, 186 N.J. at 494 (quoting Rosenberg, 352 N.J. Super. at 401), when he testified about his method of determining the items' prices, which included online research of the same kind he employed to price items as a professional toy seller.  He also explained why he could not merely go to Walmart's website to determine how it priced the items in 2016.  That Walmart may have charged less than fair market value does not render Zaitz's conclusions about fair market value a net opinion.  Thus, we discern no abuse of discretion in the judge's decision to admit Zaitz's expert testimony and no basis to intervene.

### III.

Next, defendant argues the judge violated his Sixth Amendment right to present a defense and his right to a fair trial by limiting his testimony in two areas.  First, he contends the judge erred by not permitting him to testify about Walmart's pricing and discounting practices, arguing that this was relevant to his state of mind and thus essential to his defense.  Second, in relation to his testimony rebuffing the claim that he used his daughter to distract from the thefts, defendant asserts the judge erred by instructing him, outside the presence

of the jury, to avoid "gratuitous[]" comments and unresponsive answers during his direct examination.

"Although a trial court retains broad discretion in determining the admissibility of evidence, that discretion is abused when relevant evidence offered by the defense and necessary for a fair trial is kept from the jury." State v. Cope, 224 N.J. 530, 554-55 (2016). Criminal defendants must have "a meaningful opportunity to present a complete defense." State v. Garron, 177 N.J. 147, 168 (2003) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). The exclusion of "'competent, reliable evidence . . . [that] is central to [a] defendant's claim of innocence'" deprives him or her of that opportunity. Ibid. (quoting Crane, 467 U.S. at 690).

However, these "constitutional rights . . . 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process,' such as established rules of evidence and procedure designed to ensure the fairness and reliability of criminal trials." Id. at 169 (quoting Chambers v. Mississippi, 410 U.S. 284, 295 (1973)). "But when the mechanistic application of a state's rules of evidence or procedure would undermine the truth-finding function by excluding relevant evidence necessary to a defendant's ability to defend against the charged offenses," constitutional rights "must prevail." Ibid.

27

Evidence is relevant if it is probative of a material fact, meaning that it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. "The true test [of relevance] is the logical connection between the proffered evidence and a fact in issue, i.e., whether the thing sought to be established is more logical with the evidence than without it." State v. Hutchins, 241 N.J. Super. 353, 358 (App. Div. 1990). Relevant evidence is generally admissible, while irrelevant evidence is inadmissible. Ibid.; N.J.R.E. 402.

N.J.R.E. 611 requires the court to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence" so as to make the interrogation and presentation "effective for determining the truth" and "avoid wasting time." Consistent with a trial court's obligations under N.J.R.E. 611, "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of: (a) Undue prejudice, confusion of issues, or misleading the jury; or (b) Undue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 403. "[T]he more attenuated and the less probative the evidence, the more appropriate it is for a judge to exclude it . . . ." State v. Medina, 201 N.J. Super. 565, 580 (App. Div. 1985).

Applying these principles, we discern no violation of defendant's constitutional rights or abuse of the judge's discretionary authority. We first address defendant's testimony regarding his daughter. On direct examination, defense counsel asked defendant, "did you bring your daughter to distract anybody from anything you were engaged in?" Defendant responded:

> No, never. My daughter -- that's, like, the love of my life next to my wife there. And I was the first one that held her when she was born. We -- whenever -- at the time my wife was finishing her Ph.D., and I would work long hours so when I—

When the prosecutor objected, the judge sustained the objection and instructed defendant:

> I'm sustaining the objection. . . . Please just answer the question that's posed. You're having a tendency to expound and editorialize. I'm asking you to please restrict your answer to the question posed. It was a very specific question. Next question, please.

Defendant's direct examination resumed thusly:

> [DEFENSE COUNSEL:] Just to be clear, on the three or four occasions your daughter was with you in the videos, was there any effort or interest you had in bringing her to try and distract anyone?
>
> [DEFENDANT:] No.
>
> [DEFENSE COUNSEL:] Were you just spending time with your daughter?

[DEFENDANT:]  I was.

As defendant's direct examination continued, the judge excused the jury and addressed defense counsel as follows:

> I have not interceded, but you are leading the witness question after question.[1]  Secondly, this witness has gratuitously offered time and again expounding on answer after answer.  For example, editorializing to include references to his daughter is the love of his life and that he is the first person to hold the child . . . .  That his wife is a Ph.D. applicant, et cetera.  I can go through and waste more time.

In response, defense counsel asked the judge whether defendant was "allowed to explain" why his daughter was with him, to which the judge responded:

> Totally he can.  Without the gratuitous commentary.  Of course, he is entitled to.  No, sir, I would routinely bring my daughter.  We spend a lot of time together, and she would go on errands with me all the time.  Absolutely.
>
> It's the attempt to engender sympathy and empathy, which is strictly prohibited by the case law and by the instructions themselves.  And he has repeatedly crossed the line on that. . . .  I'm instructing

---

[1]  N.J.R.E. 611(c) provides that "[l]eading questions should not be used on direct examination except as necessary to develop the witness' testimony."  N.J.R.E. 611(c).  A question is leading if "it suggests what the answer should be or contains facts which in the circumstances can and should originate with the witness."  State v. Abbott, 36 N.J. 63, 79 (1961).

him to refrain from that. Of course, he can explain himself and I've not impeded him in one regard.

The record does not support defendant's claim that the judge prevented him from defending against the accusation that he used his daughter to distract attention from the thefts. The judge's admonition to limit the scope of defendant's answers to the questions posed and avoid gratuitous comments to engender sympathy was a reasonable exercise of the court's responsibility under N.J.R.E. 611(a). See State v. Jones, 346 N.J. Super. 391, 404-05 (App. Div. 2002) (noting that the defendant's proffered testimony regarding "the circumstances" and "educational" purposes of taking her thirteen-year-old son to Peru without informing the child's father to defend against a charge of interference with custody was "irrelevant and unduly prejudicial" and an improper "attempt to engender sympathy or generate confusion"). "The extent and manner of the examination remains under the control of the trial judge, N.J.R.E. 611(a), subject to defendant's overriding constitutional right to present a defense." Jones, 346 N.J. Super. at 405. We are satisfied defendant's constitutional right to present a defense was not violated here.

We now turn to defendant's testimony regarding Walmart's pricing and discounting practices. During direct examination, defendant testified that he purchased items with the allegedly fraudulent barcode stickers on them on

31

several occasions. He explained that he found the items that way, that "Walmart has various different tags," and that "[i]t looked like they were discounted. Like, it was a discount sticker." Defendant stated that the prices varied and although the items appeared as Vision vs. Sub-Ultron toys on the receipts, which he knew was "a Marvel character," "it seemed to be referencing . . . a . . . comic type of identification."

When defense counsel asked defendant about "[his] understanding" of "how" or "[why] Walmart discounts [items]," the judge sustained the State's objection, explaining defendant was "not competent to testify to Walmart's practices." However, the judge permitted defense counsel to "try to lay a foundation." Based on the judge's ruling, the following questioning ensued:

> [DEFENSE COUNSEL:] Okay. Sure. How long have you been shopping at Walmart?
>
> [DEFENDANT:] I have been shopping at Walmart, I'd say probably over [ten] years.
>
> [DEFENSE COUNSEL:] And what about shopping for toys there?
>
> . . . .
>
> [DEFENDANT:] I would definitely say it's over [ten] years.
>
> [DEFENSE COUNSEL:] Okay. And during the course of the time have you seen items discounted?

32

[DEFENDANT:]  Frequently.

[DEFENSE COUNSEL:]  Okay.  And during the course of that time have you engaged in conversation with people who work at Walmart?

[DEFENDANT:]  Yes.  And I've even made videos with employees during those conversations.

     . . . .

[DEFENSE COUNSEL:]  During the course of your time, did you come to observe patterns with regard to how Walmart would discount items or there may or may not be sales?

[DEFENDANT:]  Yes.

[DEFENSE                    COUNSEL:] Okay.  And what observations did you make?

[DEFENDANT:]    Walmart—so  Walmart  has  a clearance aisle, but they also have end caps, and then they have open space in their aisles.  A lot of the merchandise, as you saw with the Star Wars video, the merchandise on a lot of these items come out months in advance of the movies or certain events, and they are put out and then those main retailers' job is to move those items—

The prosecutor objected.  Outside the presence of the jury, the prosecutor argued defendant was "attempting to testify as to the pricing practices at Walmart" without any testimony that he was "a Walmart employee, that he ever worked there, [or] that he has specific knowledge of any of this."  Defense

33                                    A-2210-19

counsel countered that if defendant was not allowed to testify about "his state of mind when he [was] making these purchases and what his state of mind [was] with regard to why that seemed like a reasonable purchase and a reasonable sales practice, then [he was being] denied the opportunity to state [a] defense to th[e] charges."

In sustaining the State's objection, the judge concluded that the testimony was "an end run or backdoor" attempt to have defendant "testify as an expert in the price and marketing practices of Walmart." The judge expounded:

> [Defendant] has absolutely no expertise in that, other than the fact that he is an avid toy collector.
>
> . . . . This is so far afield from any semblance of a direct examination that it violates virtually every ten[e]t of a direct examination.
>
> The [c]ourt has gone to great lengths to give an extraordinary berth to the defense. But this is far and beyond. Much of what [defendant] is purporting to testify regarding pricing and marketing of Walmart is based supposedly or is embedded with hearsay on supposed communications with Walmart employees who are unnamed. There's been no expert report tendered. And, of course, [defendant] is permitted to defend himself, but he is not permitted to usurp the Rules of Evidence, and Rule 702 in particular, and testify as a pseudo expert. And that's exactly what's going on.

When defendant's direct examination resumed, he testified that he "believe[d] the discounts" were "reasonable" based on his experience shopping at Walmart. He denied making the stickers or placing them "on any of the items" he purchased. Defendant stated he had previously seen barcodes, "[s]imilar" to those he was accused of fabricating, on items at Walmart. Defendant also testified that on the day of his arrest, he scanned the barcode stickers at a "scanner in the aisle" to verify their price before going to the self-checkout to purchase the items. In summation, defense counsel stressed that defendant's testimony in this regard demonstrated defendant's innocent mental state.

The record does not support defendant's contention that the judge's ruling precluded him from establishing his state of mind. Indeed, defendant testified he believed the discounts were reasonable based on his experience shopping at Walmart over the years. The judge correctly ruled that defendant could not testify to Walmart's pricing practices and the use of specific barcodes because "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." N.J.R.E. 602. No such evidence was introduced here in connection with Walmart's pricing and discounting practices. Because we find no errors, defendant's cumulative error argument also fails. See State v. Weaver, 219 N.J.

35

131, 155 (2014) ("If a defendant alleges multiple trial errors, the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair.").

IV.

Defendant also argues that the judge erred in denying his sequential motions to disqualify the UCPO based on "taint and prejudice" that created "a conflict of interest." Defendant asserts he was a police officer with the UCPD "for nearly ten years" and "loaned to the [UCPO], specifically working in the Narcotics Taskforce." According to defendant, "[i]t [was] this employment and the circumstances surrounding it that required [r]ecusal of the [UCPO]." Specifically, defendant contends that "[t]he closeness of the relationships" between himself and certain members of the UCPD and the UCPO, "particularly involving previous negative and adverse determinations on credibility and disciplinary action," justified "disqualify[ing] the entire office" because "these individuals were all involved in critical aspects of the criminal investigation leading to [his] prosecution and ultimate conviction."

By way of background, on May 12, 2016, Assistant Prosecutor John Esmerado, through then First Assistant Prosecutor Thomas Isenhour, sought approval from the Attorney General's Office to continue the investigation and

36

ultimate prosecution of defendant, advising in an email that defendant "was temporarily assigned to the [UCPO's] Narcotics Strike Force" from 2009 to 2011 and "was a productive member of the team." Esmerado also stated that defendant was "currently suspended for a variety of administrative issues that total over [fifty] administrative infractions," and, "[i]n the Fall of 2015," had "filed a notice of tort claim against his acting chief and several supervisors" in the UCPD. According to Esmerado, following an investigation of the allegations contained in the notice of tort claim by the UCPO Internal Affairs Unit, none of defendant's claims was substantiated.

On May 24, 2016, the Attorney General's Office responded that it did "not appear that this matter constitute[d] a direct conflict requiring supersession by the Division of Criminal Justice." See N.J.S.A. 52:17B-107a (authorizing supersession "[w]henever in the opinion of the Attorney General the interests of the State will be furthered by" that action). It advised that the UCPO could continue the investigation and prosecution but directed that "detectives or prosecutors who have a personal relationship with [defendant] have no contact with investigative and prosecutorial staff in the investigation and prosecution of this matter."

In September 2016, defendant was indicted. Esmerado represented the State at the grand jury proceeding. On January 20, 2017, defendant moved to disqualify the UCPO on the ground that "Esmerado [was] a witness regarding the investigation of [defendant's] notice of tort claim" and "[would] be called as [a] witness[]" along with other investigators in the UCPO who were involved in the tort claim investigation. In an order entered April 28, 2017, the Assignment Judge denied the motion.[2]

In an oral decision, the judge detailed the basis for defendant's conflict of interest claim, stating that after defendant sent a "whistleblowing" complaint in July 2013, outlining his "concerns regarding the [UCPD's] . . . racial profiling and coercion of suspects," he was allegedly "targeted by the [UCPD] and was issued a number of complaints and notices of disciplinary action." The judge further explained:

> Of particular note, on June 16[,] 2015, defendant was issued a preliminary notice of disciplinary action related to a suppression hearing involving a motor vehicle stop conducted by . . . defendant. The matter was heard by our Presiding Criminal Judge . . . who in her written decision made negative credibility findings against . . . defendant.
>
> On August 27[, ]2015, defendant filed a notice of tort claim against the [UCPD] alleging disparate

---

[2] Defendant also requested a change of venue, which was denied.

treatment, harassment, hostile work environment, and retaliation, among other violations. . . . On March 4[, ]2016[,] the [UCPO] closed its [i]nternal [a]ffairs investigation concerning . . . defendant's complaint against certain members of the [UCPD]. The UCPO found that all of defendant's claims could not be substantiated . . . .

The Assignment Judge concluded that "[t]he involvement and interest" of members of the UCPO did not constitute "sufficient grounds for disqualification of the entire office." The judge pointed out that "[t]he involvement and potential testimony . . . may be grounds for the recusal of . . . Esmerado" if that testimony is permitted but Esmerado would be able "to turn th[e] matter over to another attorney within" the UCPO.

On February 23, 2018, a different assistant prosecutor re-presented the case to the grand jury and obtained a superseding indictment containing the same charges. On April 13, 2018, defendant filed a second motion to disqualify the UCPO. Prior to the adjudication of defendant's second disqualification motion, on May 21, 2018, the State moved in limine to prevent defendant from presenting evidence at trial of his disciplinary history with the UCPD and his tort claims act allegations investigated by the UCPO.

On September 18, 2018, a different judge granted the State's in limine application, finding the evidence inadmissible under N.J.R.E. 403. In support,

the judge characterized "as tenuous" defendant's "argument that the [i]nternal [a]ffairs and tort claims documents [were] probative of racial bias or mistreatment of defendant." Further, "even assuming . . . the evidence ha[d] some relevance . . . , any probative value . . . [was] substantially outweighed by the risk of undue prejudice[,] confusion of issues[,] and misleading the jury."

Thereafter, in an order entered on December 12, 2018, the Assignment Judge denied defendant's second disqualification motion. In an oral decision placed on the record on December 11, 2018, the judge relied in part on the State prevailing in its motion to preclude admission at trial of "evidence of [defendant's] past interactions with the [UCPD] and the [UCPO]." The judge also rejected defendant's contention that the re-presentment of the case to the grand jury with a "new prosecutor and toy expert" was "an attempt to cover up the bias and prejudice against defendant exhibited by their office."

In support, the judge recalled that defendant had previously challenged the first indictment because of the involvement of Esmerado as well as the State's reliance on the opinion testimony elicited from Vincent Gagliardi, a UCPO Captain and a former member of the UCPO's Narcotics Task Force during the time defendant had been assigned there. However, according to the judge, when the case was re-presented, "the State retained an independent toy expert in

the place of . . . Gagliardi" and replaced Esmerado as the prosecuting attorney. Thus, the judge concluded defendant had once again failed to present any valid reason to disqualify the entire office.

On appeal, defendant's disqualification arguments focus on one UCPD internal affairs investigator, Kaminskas, and two UCPO employees, Marcantonio and Gagliardi. Kaminskas was a Lieutenant in the Internal Affairs Unit of the UCPD at the time of defendant's arrest. Kaminskas had conducted the internal affairs investigations into several of the disciplinary complaints filed against defendant by UCPD in 2014 – sustaining some and dismissing others. Defendant's notice of tort claim did not directly allege any wrongdoing by Kaminskas.

Kaminskas was initially involved in the theft investigation before the UCPO officially assumed responsibility for it, and Kim had met with Kaminskas, who by then had retired. Although Kim had already learned about defendant shopping at Target before speaking with Kaminskas and had served Target with a grand jury subpoena, Kaminskas had told Kim that he was aware of defendant shopping at Target through police gossip.

UCPO Lieutenant Marcantonio conducted the internal affairs investigation into the notice of tort claim defendant filed against the UCPD. In

a February 10, 2016 report, Marcantonio concluded that defendant's claims could not be substantiated. Kim had first learned that defendant shopped at Target from Marcantonio but was unsure about the source of Marcantonio's information. However, defendant had discussed shopping at Target in some of his YouTube videos.

Finally, UCPO Captain Gagliardi was one of several UCPO employees Marcantonio consulted "to determine which allegations [in defendant's notice of tort claim], if true, constituted potential violations of the criminal Code or the Rules and Regulations of the [UCPD.]" Gagliardi was himself a toy collector. Initially, Gagliardi had assisted Kim in identifying defendant's Walmart and Target purchases from surveillance footage and had testified during the first grand jury presentment. However, Gagliardi was later replaced by Zaitz.

Defendant contends that the participation of these three individuals in the theft investigation "should have resulted in disqualification of the entire prosecutor's office." His argument can be broken down into three components: (1) their participation presented two "conflict[s] or ethical violation[s] that would apply to an attorney," the first relating to the manner in which Kaminskas and Marcantonio obtained information about defendant shopping at Target, and the second relating to the fact that these three individuals were biased from

previously investigating defendant's disciplinary complaints and the allegations in his notice of tort claim; (2) any ethical rules violated do, in fact, also "appl[y] to non-lawyer assistants or investigators working on behalf of attorneys, like . . . Marcantonio and . . . Kaminskas" under RPC 5.3; and (3) "[n]o effort at walling off [UCPO] employees" previously involved with defendant could have ensured he received a fair trial.

Whether a conflict of interest exists that requires disqualification of an attorney or firm from representing a party is a question of law. J.G. Ries & Sons, Inc. v. Spectraserv, Inc., 384 N.J. Super. 216, 221-22 (App. Div. 2006). Accordingly, we review a trial court's decision on the issue de novo. Ibid.

"Disqualification must be based on an actual conflict or potential conflict of interest, as . . . defined by the [Rules of Professional Conduct (RPCs)]." State v. Hudson, 443 N.J. Super. 276, 289 (App. Div. 2015). Although New Jersey attorneys were once required to avoid ""even the appearance of impropriety" that casts doubt upon the integrity of the criminal process,'" the "'appearance of impropriety'" doctrine is not currently "a factor to be considered in determining whether a prohibited conflict of interest exists under RPC 1.7, 1.8 or 1.9." Id. at 287-89 (first quoting In re Militia, 99 N.J. 336, 342 (1985); and then quoting In re Sup. Ct. Advisory Comm. on Pro. Ethics Op. No. 697, 188 N.J. 549, 568

(2006)). Thus, "[c]onflicts must be actual and not merely appearance based." Id. at 292. This "change occurred in 2004, when the RPCs were amended to eliminate the 'appearance of impropriety' provisions from all RPCs[.]" Id. at 288. See Ethics Op. No. 697, 188 N.J. at 568 ("[W]e hold that the 'appearance of impropriety' standard no longer retains any continued validity in respect of attorney discipline.").

Even when the "appearance of impropriety" doctrine was in use, we avoided disqualifying entire prosecutors' offices under circumstances that would require disqualification of a single prosecutor, such as "when a defendant [sought] to call a member of the prosecutor's office as a witness." State v. Irizarry, 271 N.J. Super. 577, 600 (App. Div. 1994). Similarly, in State v. Harvey, 176 N.J. 522, 524-29 (2003), the Court held that a defendant's "bare assertion of prosecutorial misconduct" was insufficient "to disqualify an entire prosecutor's office from representing the State in connection with" that defendant's post-conviction relief petition, which alleged that the office had destroyed potentially exculpatory evidence.

The Harvey Court noted that its "evaluation of an actual or apparent conflict, or of an appearance of impropriety, 'does not take place "in a vacuum," but is, instead, highly fact specific.'" Id. at 529 (quoting In re Op. No. 653 of

the Advisory Comm. on Pro. Ethics, 132 N.J. 124, 132 (1993)).  Indeed, to warrant disqualification, the asserted conflict must be "something more than a fanciful possibility" and "must have some reasonable basis."  Ibid. (quoting In re Op. No. 653, 132 N.J. at 132).  Applying those tenets, the Court determined that the defendant made "no specific claim of misconduct against" the assistant prosecutor handling the matter, "[n]or ha[d] there been any finding of impropriety against" any member of the office.  Id. at 529.  Moreover, the Court reasoned that "[a] rule that required [it] to disqualify an entire prosecutor's office because of allegations against one or two of its members likely would lead to significant disruptions within the criminal justice system."  Id. at 532.

Here, defendant's assertion that a conflict requiring disqualification arose because the information that defendant shopped at Target resulted from "a personal relationship [with] co-workers," rather than "through traditional (and permissible) investigation," lacks legal or factual support.  Notably, the information was available on defendant's YouTube channel.  Nor has defendant demonstrated that Kaminskas, Marcantonio, or Gagliardi had any bias against him or any "personal interest" in the outcome of the case that would have created a "significant risk that the [UCPO's] representation" of the State would "be materially limited."  RPC 1.7(a)(2).

45

Further, because the investigation arose from an independent, unsolicited eyewitness account by civilian witnesses, ended with a finding of guilt by an impartial jury, and none of the purportedly interested individuals represented the State at trial, as in Harvey, a blanket disqualification of the entire prosecutor's office was not warranted nor "mandated under our existing jurisprudence." 176 N.J. at 532-33. Therefore, we find no error in the Assignment Judge's denial of defendant's motions to disqualify the UCPO.

V.

Additionally, defendant argues that the judge committed reversible error by not inquiring of defendant or counsel about defendant's decision to testify. "The practical result . . . of a defendant's decision to testify is to effect a waiver of his constitutional privilege against self-incrimination . . . ." State v. Bogus, 223 N.J. Super. 409, 422 (App. Div. 1988). "[W]hen a defendant is represented by counsel, the court need not engage in a voir dire on the record to establish defendant's waiver." State v. Ball, 381 N.J. Super. 545, 556 (App. Div. 2005). "Nevertheless, . . . 'the better practice [is] for a trial court to inquire of counsel whether he or she has advised a defendant . . . of his or her right to testify[,]' [o]r, alternatively, to advise defendant directly." Ibid. (second and third

alterations in original) (citation omitted) (quoting State v. Savage, 120 N.J. 594, 631 (1990)).

Here, defendant does not argue that his waiver was unknowing. Instead, he asserts that "[t]he 'better practice' . . . [was] not followed" given the absence of an "advisement or colloquy" on his decision to testify. However, because defendant was represented by counsel, the trial court was "not [required to] engage in a voir dire on the record to establish defendant's waiver." Ibid. Accordingly, we find no reversible error.

## VI.

Finally, defendant argues that his convictions must be vacated because the proofs were "deficient" and "the verdict was against the weight of the evidence." Following the guilty verdict, defendant moved for a judgment of acquittal notwithstanding the verdict as to the official misconduct charge pursuant to Rule 3:18-2. Earlier, at the close of the State's case, defendant had unsuccessfully moved for a judgment of acquittal pursuant to Rule 3:18-1. However, defendant never filed a motion for a new trial pursuant to Rule 3:20-1, which provides in relevant part:

> The trial judge shall not . . . set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly

and convincingly appears that there was a manifest denial of justice under the law.

Under Rule 2:10-1, "[i]n both civil and criminal actions, the issue of whether a jury verdict was against the weight of the evidence shall not be cognizable on appeal unless a motion for a new trial on that ground was made in the trial court." As we explained in State v. Johnson, 203 N.J. Super. 127, 133 (App. Div. 1985), a motion for a judgment of acquittal pursuant to Rule 3:18-1 will not satisfy Rule 2:10-1's requirement that an appellant move for a new trial in the trial court because "[a] motion made at the close of the State's case is controlled by a different standard than a motion for a new trial." The same reasoning applies to a Rule 3:18-2 acquittal motion made following the verdict.

> Rule 3:18-1 provides that a court must enter a judgment of acquittal after the close of the State's case or after the close of the defendant's case if "the evidence is insufficient to warrant a conviction." Rule 3:18-2 is an additional safeguard, authorizing a court to enter a judgment of acquittal even after the return of a verdict of guilty, when the evidence does not rationally support a conviction. The power to enter a judgment of acquittal cannot be invoked because a judge has a mere difference of opinion with the outcome of a trial; it can be invoked only to prevent a miscarriage of justice.

> In assessing a motion for a judgment of acquittal notwithstanding the verdict pursuant to Rule 3:18-2, a reviewing court must view the entirety of the direct and

circumstantial evidence presented by the State and the defendant and give the State the benefit of all the favorable evidence and all the favorable inferences drawn from that evidence, and then determine whether a reasonable jury could find guilt beyond a reasonable doubt.

[State v. Lodzinski, 249 N.J. 116, 143-44 (2021) (citation omitted).]

See also State v. Williams, 218 N.J. 576, 594 (2014) (applying that standard after the close of the defendant's case under Rule 3:18-1); State v. Reyes, 50 N.J. 454, 458-59 (1967) (applying that standard after the close of the State's case under Rule 3:18-1).

"Our review of a motion for a judgment of acquittal under Rule 3:18-2 is de novo." Lodzinski, 249 N.J. at 145. We will "assess the sufficiency in the record anew, and therefore we owe no deference to the findings of . . . the trial court." Ibid. We will not, however, consider defendant's argument that the jury verdict is against the weight of the evidence because defendant failed to preserve the issue by moving for a new trial on that ground. See Fiore v. Riverview Med. Ctr., 311 N.J. Super. 361, 362-63 (App. Div. 1998) ("[T]here must be strict enforcement of the prohibition of Rule 2:10-1 against this court considering an argument that a jury verdict is against the weight of the evidence when no motion for a new trial was made.").

Defendant was convicted of official misconduct in violation of N.J.S.A. 2C:30-2(a), which states:

> A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself . . . [h]e commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner . . . .

"[W]hen law-enforcement officers commit an act of malfeasance because of the office they hold or because of the opportunity afforded by that office, their conduct sufficiently relates to their office to support a conviction under" the statute. State v. Bullock, 136 N.J. 149, 157 (1994). In Bullock, the Court upheld the conviction of a suspended state trooper who "showed his State Police identification card and told a municipal policeman that he was a state trooper" when the officer pulled him over on information that the defendant and other persons in the car were armed. Id. at 152, 157. The Court reasoned that the "defendant abused his position of apparent authority," and "[t]he jury readily could have found that defendant purported to act not as a private citizen but as a state trooper in violation of the statute." Id. at 157.

In State v. Hinds, 143 N.J. 540, 541-42 (1996), the Court determined that the conduct of the defendant, an off-duty police officer who conspired with the private security manager of a store to engage in shoplifting, "was sufficiently

50

related to his official status to constitute the crime of official misconduct." The Court found that the defendant's "conduct and statements" to store employees "demonstrate[d] that the jury could find that [the defendant] . . . used his office to instill a false sense of security and to avoid suspicion." Id. at 546-47.

Here, the official misconduct charge related to defendant's conduct on February 21 and March 19, 2016, when he made purchases at the Linden Walmart while in uniform, as well as the statements he made to loss prevention personnel at the Edison Walmart on March 19, 2016. The State alleged that defendant used his uniform "to deter his detection" for theft "by store personnel" at the Linden Walmart and that he used his position "to deter store personnel at" the Edison Walmart "from reporting his alleged thefts to law enforcement."

Regarding the March 19, 2016 Edison Walmart incident, as in Bullock, a reasonable jury could have found that defendant identified himself as a police officer while engaging in theft for the purpose of avoiding detection and arrest. The jury could have reached this conclusion based on Troya's and Parada's corroborating testimony that defendant identified himself as a police officer and offered to pay for the merchandise once calling the police was mentioned. Thus, a jury could reasonably infer from their testimony that defendant identified himself as a police officer to persuade them not to call the police. Regarding

51

the February 21 and March 19, 2016 Linden Walmart incidents, as the judge pointed out in denying defendant's acquittal motion, based on defendant's own testimony that he shopped in uniform to make people feel safe, the jury could have inferred that defendant was aware that wearing a police uniform would have an effect on those who viewed him and exploited this effect to facilitate his thefts.  As in Hinds, defendant's conduct permitted the inference that he "used his office to instill a false sense of security and to avoid suspicion."  Id. at 546-47.

Defendant asserts that his own testimony denying the allegations against him, contradicting Troya's and Parada's assumptions, and providing innocuous explanations for his statements and conduct "illustrate[] even further the lack of evidence" of official misconduct.  However, viewing de novo "the entirety of the direct and circumstantial evidence presented by the State and the defendant" and giving "the State the benefit of all the favorable evidence and all the favorable inferences drawn from that evidence," we are convinced that "a reasonable jury could find guilt beyond a reasonable doubt," and we discern no "miscarriage of justice."  Lodzinski, 249 N.J. at 143-44.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION